**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-CR-169 (JMC)** |
| **v.** | : | |
| | : | |
| **CONLIN WEYER,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Conlin Weyer to 60 days of incarceration, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Conlin Weyer, 22, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Defendant Weyer pled guilty to one count of violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds).  As explained herein, a sentence of 60 days incarceration is appropriate in this case because Weyer entered the Capitol after having climbed through scaffolding on the West Terrace, and after he had personally observed police officers physicaly engaging rioters in an effort to prevent rioters like himself from entering the building. Weyer spent over 35 minutes inside the Capitol all the while yelling, taking videos, and celebrating with his fellow rioters.  He did not immediately leave the Capitol grounds after he was pushed out of the East Rotunda doors.  Instead, he made his way to a police vehicle, climbed on top of it, and took a video of himself proudly exclaiming:  "We got the real-ass patriots out here."   Prior to the events of January 6, Weyer made clear his knowledge of the Joint Session of Congress inside the Capitol that day, and stated unequivocally on social media that he wanted to stop the 2020 presidential election from being certified.

The Court must also consider that Weyer's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Weyer's crime support a sentence of 60 days of imprisonment

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense), at 1-7.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Weyer's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Weyer traveled by himself from a family member's home in Viriginia Beach, VA, to Washington, D.C., to protest the results of the 2020 election.  Prior to traveling, Weyer posted on social media and proudly announced his intentions, stating on Parler:  "I would like to announce, I will be protesting with my American brothers and sisters on Capitol Hill, January 6th, DC.  Stop the steal!  We must stand strong, stand proud, and fight this fraudulent election from being certified!  We need 4 more years of President Donald J. Trump!"  Weyer attended the former President's "Stop the Steal" rally at the Elipse and subsequently made his way to the Capitol and the restricted grounds around the Capitol.

Weyer approached the Capiotl from the West Front.  While on restricted grounds, Weyer observed multiple steel barriers knocked over, which were meant to keep him and his fellow rioters out of the area, and he continued on towards towards the Capitol itself.  Shortly after making his way onto the West lawn, Weyer and other  members of the mob became more agitated when they heard that the former Vice President was going to certify the election.  At that point, Weyer heard other members of the mob chanting "Hang Mike Pence."



*Image #1 (third-party screenshot showing Weyer outside the Capitol)*

Weyer continued onward, further encroaching on restricted grounds, because he "wanted to get closer to the front" where he saw people climbing scaffolding past the police. Weyer also saw tear gas being deployed, physical pushing between officers and other members of the mob, and other crowd control tactics being used by the police against the onslaught of the rioters. Despite seeing all of this, Weyer himself climbed the scaffolding on the west side of the Capitol that was being built for he upcoming inauguration, filmed himself saying "we are taking this shit," and posed for a photograph with his middle finger raised after he asceneded to the Upper West Terrace of the Capitol building.

At approximately 2:30 p.m., Weyer enteered the Capitol building through the Upper West Terrace doors. At the Upper West Terrace doors, an alarm was blaring, there was a sign on the door saying that this was an emergency exit, and there were also boxes on the flor indicating that

this was not an entrance.  Once inside the Captiol, Weyer saw other rioters trying to break into doors and doing other damage to the Capitol,



*Image #2 (CCTV screenshot showing Weyer entering the U.S. Capitol at the Upper West Terrace Door).*

Weyer also encountered a police officer inside the Capitol, who Weyer could see was scared and overwhelmed.  The police officer told Weyer that other rioters had hurt his fellow officers and told Weyer to leave.  Despite this interaction, Weyer did not leave.  He stated inside the Capitol for about another fifteen minutes taking videos and pictures and celebrating with his fellow rioters.   Despite having seen the chaos and violence outside and inside the Capitol, Weyer was proud of what he and the rioters were doing,  at one point encouraging other rioters by shouting out loud "this is how conservatives make history!"[2]

---

[2] A copy of this recording will be provided to the Court as **Exhibit A**.



*Image #3 (Third-party screenshot of Weyer celebrating with a fellow rioter inside the Capitol).*

Police officers finally forced Weyer out of the Capitol through the East Rotunda Doors. As he left, Weyer raised his fist and shouted triumphantly. But even though he had left the building, Weyer refused to leave the Capitol grounds. Weyer remained on Capitol grounds for about an hour after he left the building. During this time, he witnessed other rioters continue to try and breach the East Rotunda Doors after he and other rioters had been forced out. He saw rioters swinging flag poles, and push up against police officers. Despite this, Weyer "wanted to hang out for a while." On the East Front, he later climbed a police SWAT tactical vehicle that was called in for assistance, and took a video of himself and other rioters, stating "we got the real-ass patriots out here!".[3] Weyer finally left the Capitol grounds shortly after this.

---

[3] A copy of this recording will be provided to the Court as **Exhibit B**.



*Image #4 (Third-party screenshot of Weyer exiting the Capitol and cheering).*

*Defendant's Interview*

Weyer gave a voluntary interview after he was arrested by the FBI.  During the interview, he admitted to traveling to Washington by himself from his family member's home in Virginia Beach on January 6, 2021.  He admitted that his purpose in being there was to protest the Certification of the presidential election

Weyer admitted that as he approached the Capitol, he saw fallen barriers and witnessed other rioters being tear gassed and pepper-sprayed.  He also saw police trying to hold back members of the mob.  But Weyer tried to minimize and downplay his conduct — he claimed incredibly that when he saw other rioters getting tear-gassed he "tried to help people get away

from it".  He also claimed he "wanted to get closer to the front so that he could continue helping people."  Weyer admitted that a police officer directly told him to leave the building, and that he ignored this request by staying in the building for several additional minutes.Weyer admitted that long before he left the building, he knew he was not allowed inside.

*The Charges and Plea Agreement*

On May 10, 2022 the United States charged Weyer by criminal complaint with Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) (Count 1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count 2); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 3); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 4). On May 13, 2022, law enforcement officers arrested Weyer.  On May 18, 2022 the United States charged Weyer by a four-count Information with violating the statutes listed above.   On April 13, 2023 pursuant to a plea agreement, Weyer pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Weyer now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Weyer's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | +4 |

*See* PSR at ¶¶ 32-40.

The U.S. Probation Office calculated Weyer's criminal history as Category I.  PSR at ¶45. Accordingly, the U.S. Probation Office calculated Weyer's total adjusted offense level, after acceptance, at 4,  and his corresponding Guidelines imprisonment range at zero to six months. PSR at ¶88. Weyer's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Weyer's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Weyer, the absence of violent or destructive acts is not a mitigating factor. Had Weyer engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Weyer's case is his reaction to the acts of violence and mayhem that he witnessed before he entered the Capitol. Weyer described seeing his fellow rioters being pushed back physically by police officers who were trying to defend the Capitol that day. He also saw multiple rioters get exposed to tear gas and other crowd control devices, and walked past multiple barriers on his way into the Capitol. Weyer took advantage of this chaos and entered the Capitol after overwhelmed police officers had to retreat in the face of the onslaught.

10

By his own admission, Weyer ignored an officer's plea for him to leave the building. Weyer could have turned around at any point after having witnessed this chaos, especially after hearing directly from this police officer. Instead, he continued on, and continued to celebrate the riot. Weyer even celebrated after he left the Capitol, filming himself on top of a police vehicle saying the "real-ass patriots" were at the Capitol.

Weyer also sought to downplay his role in contributing to the avalanche of rioters who overwhelmed the police defending the Capitol. When asked about seeing multiple rioters being hit with tear gas, Weyer claimed that he continued advancing on Capitol grounds and into the building itself because he "wanted to help as many people as he could." While Weyer may have provided "comfort" to fellow rioters who were storming the Capitol, this is a self-serving distortion of Weyer's true intent on January 6th, which was to be part of the chaos, and to disrupt the proceedings that were taking place in the Capitol that day. Weyer was not "caught up with the crowd" on January 6 —he was unhappy with an election result that he disagreed with, and he wanted to disrupt the peaceful transition of power.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Weyer

Nothing in Weyer's background explains or mitigates his decision to engage in criminal conduct on January 6.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the

impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As stated aboe, while Weyer did not engage in violence, he took full advantage of the violence that was taking place on January 6 to enter the Capitol with a mob at his back.  Weyer made clear that he wanted to "fight" the Certification of the presidential election results.  Weyer also celebrated the events of the day, suggesting that he and the other "real-ass patriots" were proud of what they did. Weyer must understand that his conduct will not be tolerated, and that participating in a riot is an unacceptable way to demonstrate frustration with an election.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Weyer based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Weyer has pleaded guilty to Count One of the Information, charging him with violating 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing

14

philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Adam Johnson* 21-cr-648 (RBW), the court sentenced Johnson to 75 days' incarceration for his violation of § 1752(a)(1). Like Weyer, Johnson entered the Capitol after ascending the scaffolding on the west side of the building and witnessed police officers trying to hold rioters back, including using crowd control tactics such as tear gas. And like Weyer,

Johnson took several pictures and videos and celebrated with other rioters as he made his way to multiple parts of the Capitol. Johnson was also aware that the Electoral College votes would be counteed by Congress at the U.S. Capitol.  Unlike Weyer, Johnson posed for a photograph with a podium taken from Nacy Pelosi's office,.

In *United States v. James Bonet*, 21-cr-121 (EGS), Bonet was sentenced to 90 days' incarceration after he entered the Capitol through the west side of the building and recorded himself saying "we made it in the building bitches!  We're taking it back!"  Like Weyer, Bonet pled guilty to violating § 1752(a)(1) and celebrated with his fellow rioters.  Unlike Weyer, Bonet also entered a Senator's office and recorded himself smoking marijuana.  However, Weyer spent even more time inside the Capitol than Bonet, and also climbed on top of a police vehicle on the east side of the Capitol.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.       Restitution

16

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Weyer must pay $500 in restitution, which reflects in part the role Weyer played in the riot on January 6.[6] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022. *Id.* (As noted above in footnote 1, the amount of damages has

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

since been updated by the Architect of the Capitol, USCP, and MPD.) Weyer's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.  PSR ¶ 102.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 60 days of incarceration, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Christopher M. Cook
Trial Attorney - Detailee
U.S. Department of Justice
D.C. Bar No. 90013354