UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES | : |
| v. | : Crim. No. 22-169 (JMC) |
| CONLIN WEYER | : |

### MEMORANDUM IN AID OF SENTENCING

COMES NOW Defendant, Conlin Weyer, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits that a probationary sentence that includes a six-month period of home detention, as well as restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a) under the unique circumstances of this case.

*Procedural Background*

Mr. Weyer is before this Court after having pled guilty to one count of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).  That charge carries a maximum term of imprisonment of 1 year in prison, a fine of up to $100,000, and a term of supervised release of up to one year.   The United States Sentencing Guidelines provide a range of 0 to 6 months of imprisonment, as the defendant has no criminal history points.

He initially appeared before a magistrate-judge on May 13, 2022, and was released on his personal recognizance.  He remains in that status.

On May 18, 2022, the government filed a four-count indictment charging Mr. Weyer with Entering and Remaining in a Restricted Building, in violation of

18 U.S.C. § 1752(a)(1), two counts of Disorderly Conduct, and one count of Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On April 13, 2023, Mr. Weyer pled guilty to the first count in the information.

He has remained in compliance with his conditions of release since his arrest on May 13, 2022 – a period of about 14 months.

Mr. Weyer is scheduled to be sentenced on Thursday, September 14, 2023.

***General Background***

Defendant was charged in connection with the "very unfortunate" circumstances that occurred at the United States Capitol on January 6, 2021.

On that date, Conlin Weyer, like thousands of others, came to Washington, D.C. to hear a speech by the former president. After the speech, he, along with many other individuals, and at the direction of the former president, walked to the United States Capitol.

The marchers had been instructed by various speakers to "fight" to keep the former president in power, and many in the crowd were energized, angry, and spoiling for a fight. Mr. Weyer, unfortunately, was swayed by the former president, as well as by the firehose of disinformation he had regularly consumed in the weeks following the November 2020 election (and even in the months before), walked to the Capitol, and went inside for a period of 35 minutes.

***The Scene Inside and Outside the Capitol that Afternoon***

As this Court surely has discerned, having presided over a number of January 6 cases by now, there were varying levels of participation and action by different people, and groups of people, at the Capitol on that day, both on the grounds outside the building, and inside the Capitol itself.

Some, as has been shown in numerous video recordings, were prepared for battle, wearing military-style outfits, carrying different types of weapons (guns, sticks, batons, flagpoles that were used as weapons, pepper or bear spray, etc.) and implements of battle (zip ties, rope, etc…). Mr. Weyer had no weapon of any kind.

Many of the individuals had also posted messages in various social media platforms before January 6 indicating that it was time for a civil war, and that they would not accept the official results of the election that were certified by the 50 States.  (While Mr. Weyer did not call for a civil war, he did indicate in a Parler message that he was going to go to the District on January 6 to protest.  He added that "[w]e must …. fight this fraudulent election from being certified."[1])

However, it is equally clear that while some in the crowd were prepared for a physical battle, others went there to shout, scream, and protest the official results of the election.  Mr. Weyer was certainly not equipped for any battle.

Some entered the Capitol building, while others stayed on the grounds outside the building.  A fairly small number of people used violence to break

---

[1] It is important to remember that there were legal ways to try to contest the certification of the election, such as court challenges, and actual votes by senators and congresspersons during the certification process itself.  Taken in that light, Mr. Weyer's statement does not necessarily indicate a desire to "fight" in an illegal manner.

windows and push open doors so that they, and others behind them, could gain entry to the building.  And while some people witnessed this violence as it occurred, others arrived after windows had been smashed, and doors had been opened (and barricades removed or pushed aside).  Mr. Weyer arrived about 15 to 18 minutes after the doors on the West side were breached.

A number of protestors engaged in physical confrontations with police officers, both inside and outside the Capitol.  Some of the interactions were quite violent, and caused injuries to a number of officers.  Mr. Weyer did not engage in any such activity.

Other protestors destroyed property and otherwise vandalized some areas of some offices inside the building.  Mr. Weyer did not.

Many people shouted various chants, and some shouted at the police officers who were attempting, often in vain, to keep the crowd from entering further into the Capitol building once the crowd had breached the perimeter.  While Mr. Weyer spoke loudly about the event in two cellphone videos, he did not shout at the police or confront them in any way.

Some individuals threw flagpoles, stolen police shields, chairs, and other objects towards police officers.  Some gathered in a lower tunnel (artificially created for the inauguration that was to take place on January 20, 2021) and attempted to push their way into the building that way.

Others sprayed some officers with various substances, and were otherwise very hostile and demonstrative toward the police, aggressively screaming in their faces.

It is fair to say that the crowd, generally, was very angry about the outcome of the election, and strongly disagreed with the proposed certification of the votes by various State officials. Some in the crowd had resolved not to allow a peaceful transfer of power to a new administration.

### *Mr. Weyer's Actions that Afternoon*

Mr. Weyer's actions at the Capitol on January 6, 2021, were admittedly troublesome. He climbed the scaffolding that had been erected on the West side of the Capitol, and eventually went into the building, where he stayed for about 35 minutes.

He did peripherally observe confrontations between other individuals and police officers. One officer did tell Mr. Weyer personally that he should leave the premises, but this cannot be described as a "confrontation."

Mr. Weyer also made a short video on his cell phone while inside the Capitol, and another one outside the Capitol.

Despite this, he never assaulted anyone, pushed up against a police line, went into any lawmaker's office, or partook in any similar activity.

The government correctly notes that if Mr. Weyer had committed other criminal acts, he would have been charged with further crimes, such that his failure to commit any other criminal acts does not merit any consideration.

While that statement is partially true, the fact is that of all of the people who were in the Capitol on that day, Mr. Weyer's actions were at the lower rung of criminality. Again, he never touched any police officer or damaged any property outside or inside the Capitol. He never pushed against a police line. He never used a flagpole or other object to attempt to gain entry to any particular area of the building.

He did, unfortunately, make statements on social media where he expressed his view that the election had been stolen, and made other statements referenced in the government's memorandum.[2]

***Analysis of Sentencing Factors***

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable.

Whether or not the sentencing guidelines apply, in determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1) reflects the seriousness of the crime;

2) promotes respect for the law;

---

[2] As Mr. Weyer admitted to the presentence report writer, he had consumed a lot of politically-charged information in the months and years preceding January 6, and had gone down a conspiracy theory rabbit hole. PSR, at § 71.

3) provides just punishment;

4) deters criminal conduct;

5) protects the public from further crimes, and

6) provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

6) the need to provide restitution to any victims of the offense.

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

Mr. Weyer has proposed that this Court impose a sentence of probation that includes a six-month period of home confinement. He submits that a half-year of home confinement would adequately reflect the seriousness of his crime, as it would constitute a significant restriction on his freedom. Importantly, though, it would not cause him to lose the employment that he has held for a year and a half,

and that he loves. During the past 18 months, he has worked very hard to excel at his job, and has earned two promotions – something he is very proud of.

While one might dismiss home detention as too soft a form of punishment, it would completely restrict him to his home when he was not working or going to any medical appointments. For example, it would prevent him from going out to eat, from getting together with friends or family for any and all events (birthdays, holidays, outings, wedding, funerals, etc.), going to a movie or to a store or shopping center, as well as traveling, whether locally or nationally.

In sum, it would prevent him from doing anything he might wish to do that doesn't concern his employment or any health. It is, quite accurately home *detention*. And it would last half a year. That is real punishment, especially for a young man like Mr. Weyer.

To place his conduct in context of this factor, it is again important to recall that he did not assault anyone, destroy any property, push any officers, help others push any officers, throw any object, chant any chant, raise his fist or arms in anger, shout or berate any law enforcement officer, or give interviews to any news outlets minimizing what happened.

He entered the Capitol a full 15 to 18 minutes after the doors he went through had been breached, such that he was not "there" when the breach occurred.

While he did send one message on Parler before January 6, and created two short videos on January 6, this, even combined with his non-violent entry and

8

presence in the Capitol, does not warrant the drastic consequence – loss of Mr. Weyer's employment – that incarceration would create. This is especially true when one considers that Mr. Weyer engaged in his illegal behavior at the tender age of 19.[3]

> As Mr. Weyer explained to counsel in a recent email,
>
> "I've spent the last year and a half working very hard and getting 2 promotions to get to my position now as an assistant department manager and I'll take anything that lets me hold onto that work I put in. I've worked very hard to change as a person in and outside of my work life because of this whole ordeal. I had a hard look in the mirror and realized I wanted to be more than what that dumb 19-year-old kid was. Jail time at this point would only hinder my progress that I've made to this point. I'm not a bad person or a threat to democracy as the government paints me as in their memo. I'm just a man who made a series of bad decisions as a teenager. I do everything I can now to be better than that."

It is often difficult to determine what specific penalty will accurately reflect the seriousness of a crime, as such a determination is necessarily subjective. But again, the fact that Mr. Weyer, despite his criminal actions that day, never hurt anyone or damaged any property must count for something. Furthermore, his extreme remorse for his actions – remorse that is truly sincere – reflects a young man who has grown up a great deal in the past two and a half years, and has become a model citizen.

---

[3] As this Court knows from her prior experience litigating in the District of Columbia Superior Court, the D.C. Code recognizes, in the Youth Rehabilitation Act, 24 D.C. Code § 901, et seq., that a young man's brain is not fully developed until, typically, the age of 25. As such, the Act permits judges to sentence an offender under the Act such that if and when that offender completes his or her sentence, the very fact of conviction can be sealed from the public record. Here, not only was Mr. Weyer not 24, 23, 22, 21, or even 20 when he committed this offense. He was 19 years of age.

For that reason, he submits that a six-month period of home detention would adequately address this factor.

If this Court believes that further punishment is required, it could, along with a period of home detention, order that Mr. Weyer perform a certain number of hours of community service. That sentence would certainly be sufficient, but not greater than necessary, to achieve the goals enumerated in 18 U.S.C. § 3553(a).

### *The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Weyer, and Deter Criminal Conduct, both by him and by Others.*

These three goals would be met through the imposition of the proposed sentence under the particular circumstances of this case, for the same reasons presented above.

Notably, and perhaps counter-intuitively, respect for the law is actually *diminished* when a sentence is unfairly high. And imposing a sentence of 60 days, or even 30 or 14 days, could be seen as excessive given Mr. Weyer's age at the time of the offense, and the fact that he would lose a great job where his hard work and dedication have paid off in the form of two promotions. It is likely that he will have a good future at his company if he is allowed to keep his job. For a young kid from the Midwest who has a high school education, this type of job is a dream come true, as it offers still more opportunities for promotions.

As to deterrence, Mr. Weyer himself does not need to be deterred from future illegal conduct. His experience going through this legal nightmare has more than taught him a very hard lesson.

Deterrence of others is not a significant concern here, as anyone following Mr. Weyer's case (something that is not actually happening, and that will not be reported in the press, as it is unremarkable) could fairly wonder why someone like him would have to lose his cherished employment when he committed non-violent acts at the tender age of 19.

For the foregoing reasons, he asks this Court to impose a six-month period of home detention as part of a lengthier probationary sentence.

***The Need to Protect the Public from Further Crimes***.

Mr. Weyer is a completely different person than he was two years and 8 months ago. He clearly sees the error of his ways, and has admirably turned his life around. He has accepted responsibility for his crime, and unlike some other January 6 defendants, is clear-headed about where he went wrong.

He has no prior convictions. Despite having had a difficult family life growing up, and feeling awkward as a teenager, he obtained his high school diploma and has maintained regular employment. He went through a period of drug abuse, likely as a result of teenage insecurities and poor social connections. But he has given all of that up, and turned his life around. That is not an easy task, and he is rightly proud of his accomplishments so far.

11

He is now finally building a steady life for himself – something that is good for him as well as for society.

There is no reason to suspect that he would ever engage in criminal behavior again, as this was a very unique situation.  Further punishment is not required.

### *The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment*.

Defendant submits that, thankfully, he is not in need of any educational or vocational training services, or specific medical care.  He may go to college someday, but right now he is pleased with his relatively well-paying employment.

Although he has suffered from drug addiction in the past, he has also overcome (so far) that terrible affliction, and is on a good path in life.  He hopes he can keep moving forward as he focuses on living a clean and sober life.

### *The Need to Avoid Unwarranted Disparities*

This factor is often the most difficult one to evaluate, given the differences between defendants in cases such as these.

*Summary of Other Cases*

The government points to other cases as examples that should guide this Court in fashioning a jail sentence for Mr. Weyer.  But even in the government's own memorandum, it admits that the conduct of the defendants whose cases it references was more severe than Mr. Weyer's.

For instance, the government points to *United States v. Adam Johnson*, 21-CR-648 (RBW) as a case that is similar to Mr. Weyer's. But it admits that "[u]nlike Weyer, Johnson posed for a photograph with a podium taken from Nancy Pelosi's office."

The government's next case, *United States v. James Bonet*, 21-CR-121, also is different from Weyer's. As the government writes, "[unlike Weyer, Bonet also entered a Senator's office and recorded himself smoking marijuana."

Ultimately, every case is different. What distinguishes Mr. Weyer's case from many other cases is his youth (19) and his complete turnaround following the tragic events on January 6, 2021.

He has done everything right since his arrest, and is determined to be a law-abiding member of society for the rest of his life. He works hard, and is proud of his achievements. It would be a great shame were he forced to lose that job because of actions taken at such a young age.

### *Conclusion*

Mr. Weyer is before this Court after having pled guilty to one of the more minor charges to have been lodged against individuals who entered the U.S. Capitol on January 6, 2021.

His conduct is also among the most minor, criminally speaking, of anyone who entered the building that day.

He will lose a very good job if the Court follows the government's sentencing recommendation, and will have to start all over again despite 18 months of great effort in his "new" job.

Finally, counsel must say that when he held his first real conversation about the events of January 6 with Mr. Weyer, counsel was surprised, and gratified, to hear Mr. Weyer say that he deeply regretted having participated in that day's events, and that he couldn't fathom that he ever believed all of the things he once did. He further explained that when he looks back at his actions of nearly three years ago, he doesn't recognize that person anymore. His way of thinking has completely changed, and he feels embarrassed that he was duped by all of the propaganda and disinformation he readily swallowed.[4]

Given his fairly limited behavior on January 6, his steady and full-time employment history, and his honest remorse about his actions on that day (and determination never to become involved in something like that again), Mr. Weyer submits that a probationary sentence with a six-month period of home detention would be just and appropriate.

---

[4] Mr. Weyer also was smoking marijuana daily during the months before and after January 6, 2021, as noted in the PSR. See §§ 66, 71.

Respectfully submitted,

/s/

_____
Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 7th day of September, 2023, to all counsel of record.

/s/

_____
Stephen F. Brennwald

15